UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16 CR 92 SNLJ (ACL) |
| | ) | |
| DENNIS JAMES TROUT, | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Pending before the undersigned is the Defendant's Motion to Dismiss Indictment for Outrageous Conduct. (Doc. 19.) Dismissal of the Indictment is requested "on the grounds that it is the product of outrageous government conduct in violation of the Due Process Clause of the Fifth Amendment of the Constitution of the United States." *Id*.

This case involves a confidential informant (CI) who was willing to cooperate with law enforcement against a previously convicted felon, the Defendant, Dennis Trout. The CI reportedly believed Trout had a firearm that he would be willing to sell to the CI for $150. Trout requests the dismissal of the Indictment based on an assertion that:

> the confidential informant, an agent of the United States, *enlisted [Trout's] participation in the acquisition of a firearm with conduct* that is shocking to the conscience and unacceptable in a[n] ordered system of criminal justice, including conduct *involving threats, drugs, and sex.*

(Doc. 20 at 4, emphasis added.) As to specific allegations of misconduct by the CI, Trout claims he became involved in the sale of the firearm because the CI threatened Trout would be harmed if he didn't transfer the firearm. (Doc. 22 at 3-4.) After the transaction was completed, Trout wanted confirmation from the CI that they were "good, we're even now" and that the CI would "sick all the dogs off" him. (Def.'s Ex. 1A at 38.) The CI agreed she and Trout were even and that she would "sick all the dogs off" him. *Id*.

The Government denies that there was any outrageous conduct by the law enforcement officers, emphasizing the fact that any of the alleged threats would have occurred prior to the CI agreeing to cooperate. (Doc. 21.) The Government highlighted the fact that "Trout does not allege any connection between any improper acts of the confidential informant and the Government." *Id*. at 1. Further arguing that although Trout implied the CI may have had an improper motive, "even if that motive were factually true, that would not suffice to enable Trout to claim that an officer committed outrageous conduct." *Id*. at 2. Finally, the Government argued that Trout failed to prove that the CI was a Government agent at the time of any alleged threats and "[w]ithout showing that [the CI's] pre-informant activities were under the direction of an officer, Trout cannot attribute her actions to the Government." (Doc. 43-1 at 9-10.)

In consideration of the pleadings identified above, the evidence adduced at the hearing, which included testimony from the CI and Trout's son, as well as post-hearing briefs from the parties (Docs. 41 and 45), the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motion to Dismiss be denied.

## I. Findings of Fact

The controlled purchase of the firearm that is the subject of the Indictment took place on May 25, 2016. That transaction was between Trout, the CI, and a third party. Approximately, *two weeks earlier*, the CI purchased a BB gun from Trout that looked like a .357 pistol. *Roughly one week before* the controlled purchase on May 25, 2016, the CI claims that she gave Trout a down payment ($20 cash and/or a bag of marijuana) for a shotgun with an agreement she would pay the balance due of $125 within a few days.

In regard to the evening of the down payment, the CI explained that Trout had been going in and out of her bedroom, which was in her friend's house and where the CI had been living. The second time Trout went into the bedroom, the CI followed him to see what he was doing. Trout asked the CI to close the door and then he pulled a shotgun out of the closet and laid it on the bed. The CI responded, "[w]ow, man, that's a nice gun" and asked Trout how much he wanted for it. (Suppression Hearing Transcript, Doc. 35 at 11, hereinafter "Tr. ___.") Trout replied that he would sell the gun for $150. At the time, the CI had $20 cash and a bag of marijuana worth $20-$25 to offer as a down payment. The CI indicated she could pay the balance in a few days. (Tr. at 12.) According to the CI, Trout agreed to her offer.

After the CI negotiated the deal for the shotgun, Trout, his son, the CI, and the owner of the house had a conversation about more guns. While in the CI's bedroom, Trout had indicated there were more guns and the CI stated she might be interested in buying more. The CI indicated that when the conversation about the other guns took place, both Trout and his son said they could get some guns. (Tr. at 46.)

At the end of the evening during which the CI made the down payment, Trout and his son took the shotgun with them instead of leaving it with the CI. The CI was angry that the men didn't leave the shotgun with her and the three exchanged harsh words.

The next morning, the CI's van wouldn't start. The CI saw a wire hanging from underneath the engine area of the vehicle and believed that Trout had damaged her van. Friends of the CI, including a tough man named Davey, helped fix the van and told the CI the problem had nothing to do with the wire, the battery was dead. In any event, the CI told the men that Trout "had screwed [her] on a deal and if they see[] him, to hit him one good time for [her]." (Tr. at 32.) The CI believed that Trout had likely gotten wind of her request because "word gets around when your circles are small." (Tr. at 30.)

There is evidence that the CI made contact with Trout through the use of her friend's cell phone. Apparently the number that was being called was Trout's mother's phone. The CI acknowledged sending text messages to Trout's mother's phone, however, explained that Trout's concern about the messages was that the CI was texting late in the evening after 11. She indicated Trout appreciated the fact she stopped texting because it was late at night and his mother's phone. (Tr. at 37-38.) The CI also indicated that the text messages that were sent had nothing to do with the gun dispute but something "totally different." *Id*. at 37.

At some point, the CI made efforts to reach out to Trout to see if she could still get the shotgun and how Trout planned to deal with the money he owed her, referring to the bag of marijuana. Another friend of the CI communicated with Trout on the CI's behalf and relayed that Trout knew he owed the CI and that he was going to pay her. (Tr. 15.)

Around the same time, the CI met with law enforcement officers and volunteered to act as an informant in exchange for lenient treatment with pending criminal charges. The law enforcement officers wanted to know the type of shotgun for which she had paid a down payment, how much she owed Trout, the total price of the gun, and how long it had been since she'd made the deal. The CI also showed the officers the BB pistol she had previously purchased from Trout. The officers assisted the CI in making a phone call to Trout. During the phone call, the CI told Trout she had the rest of the money on "that deal" and asked if he still had the gun. (Tr. 19.) Trout responded that "he did not have it in his possession, but was very close, that he could still get it." *Id*.

Although the CI and Trout's son offered conflicting accounts of the terms agreed upon for the sale of the original shotgun and to whom the firearm belonged, those conflicts need not be resolved as there is a recorded conversation between Trout and the CI that reveals more details about what happened between Trout and the CI. (Def.'s Ex. A, video-recording of the May 25, 2016 controlled purchase.)

On May 25, 2016, law enforcement officers accepted the CI's offer to cooperate against Trout and arrangements were made for a controlled purchase of the firearm. The interactions between the CI and Trout were recorded. A review of the recording reveals the following:

When the CI picked Trout up to retrieve the firearm, Trout stated he actually owed $175[1] on the shotgun. The man he owed $175 was named Fox. As to the Benelli the CI was going to purchase, Trout reiterated "I owe 175 against it but 150 will get it." (Def.'s Ex. A, file "d_trout_5-24-16_#2.017" at 07:28.) Trout offered, "[s]orry about everything, man." *Id*. at 07:46. The CI expressed she was pretty upset the day Trout and his son left with the shotgun instead of trusting her to keep it until she was able to pay for it in full. Trout explained that if the CI hadn't thought the gun was stolen things would have been different. *See* Doc. 22-1 at 9, 27. Specifically, Trout stated, "[i]f it wouldn't have been for the fact that you thought we,. . .we stole it,. . .you would have had, you would have had a hold of it right now." (Def.'s Ex. A, file "d_trout_5-24-16_#2.017" at 28:05.)

Trout confirmed that his son has about ten more guns. (Def.'s Ex. A, file "d_trout_5-24-16_#2.017" at 06:53.) The two discussed the fact some of the guns that had been discussed were stolen, but Trout advised that the one the CI was going to receive that day was a "good gun," a "Benelli SuperNova" worth $600. (Doc. 22-1 at 10-11.)

Trout also wanted to be sure that the CI really wanted the gun, because if he wasn't able to get the gun, he could pay the money he owed to the CI.[2] *Id*. at 13-14.

---

[1] It makes no sense for Trout to say that he owed Fox $175 for the Benelli that was seized on May 25, 2016, if Trout's son sold the same shotgun to Fox for $300 as Trout's son testified. (Tr. 57-58, 70-72.)

[2] In this regard, if Trout did not receive a bag of marijuana and cash as a down payment for a shotgun as is suggested by his son's testimony, there is no reason for Trout to owe the CI any money. The undersigned finds that the record as a whole, including the discrepancy identified in footnote one, supports that the testimony of Trout's son is not credible.

When talking generally about guns, Trout volunteered that he was a felon, that this was his son's deal, and he was "just trying to. . .do damage control for him." *Id*. at 21. Additionally, Trout explained that his son didn't "know anything of what I'm doing at all" (Def.'s Ex. A, file "d_trout_5-24-16_#2.017" at 24:51), including the fact that Trout was with the CI. In reference to the CI indicating she was interested in purchasing guns to make a profit, Trout replied "[t]hat gun came from my buddy." *Id*. at 38:05. Trout made this comment after he purchased the Benelli from Fox.

During the drive to make the purchase, both Trout and the CI make reference to their intent to party together later that night. (Doc. 22-1 at 12, 20, 33-34, 37.) The pair also discussed the fact that the CI previously believed Trout had "messed with" her van so that it wouldn't run, but that Trout didn't do anything to the van. *Id*. at 24.

Once the gun purchase was completed, Trout and the CI talked about driving to a nearby town to purchase some drugs, as they were going to party together. Trout also stated, "[s]o, we're good, we're even now." (Def.'s Ex. A, file "d_trout_5-24-16_#2.017" at 39:20.) The CI agreed. Trout asked the CI to "[s]ick all the dogs off me" and the CI agreed that she would "sick all the dogs off [him]." (Doc. 22-1 at 38.)

The pair didn't make it to their intended destination as a traffic stop was made by the law enforcement officers and Trout was arrested.

## II.  Conclusions of Law

Trout argues that the Indictment should be dismissed based on outrageous government conduct in violation of the due process clause. He claims that the CI for

whom he acquired a firearm threatened him prior to the transaction. Trout further asserts that it was the CI's threat that caused him to purchase the firearm on behalf of the CI.

"Outrageous government conduct is a question of law. It is essentially a claim that the government's conduct was so egregious that a prosecution based upon that conduct would violate due process." *United States v. Henderson-Durand*, 985 F.2d 970, 973 n. 4 (8th Cir. 1993), citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973). The Eighth Circuit has concluded that dismissal of a charge for outrageous government conduct is only required "if it falls within the narrow band of the most intolerable government conduct." *United States v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012) (even where low level drug dealer was persuaded to identify worse criminal who was eager to sell a gun use of such an informant is "the nature of the beast in police investigations" and does not "rise to the level of outrageousness needed to support a due process violation"), citing *United States v. King*, 351 F.3d 859, 868 (8th Cir. 2003). *See also United States v. Ford*, 918 F.2d 1343, 1350 (8th Cir. 1990) ("undercover officer's providing a known addict with small quantities of drugs to facilitate and enhance the undercover relationship does not constitute outrageous conduct"); *United States v. Nguyen*, 250 F.3d 643, 645 (8th Cir. 2001) (government did not act outrageously when it directed informant to collect incriminating information about defendant's drug activity when he was participating in drug rehabilitation program); *United States v. Collins*, 755 F.Supp. 110 (S.D.N.Y. 1991) (dismissal for outrageous conduct not warranted where confidential informant "arranged" for the sale of a gun to an undercover officer, provided

the gun, "coached" the defendant on what to say, and kept all but $40 of the proceeds of the sale).

"Whereas the defense of entrapment[3] focuses on the predisposition of the defendant to commit the crime, the defense of outrageous government conduct focuses on the government's actions." *United States v. Hunt*, 171 F.3d 1192, 1195 (8th Cir. 1999), *see also Bugh*, 701 F.3d at 894, citing *United States v. Searcy*, 284 F.3d 938, 942 (8th Cir. 2002).

In discussing the entrapment doctrine, the Supreme Court speculated that someday the Court might "be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. . ." *Russell*, 411 U.S. at 431-32. Many circuit courts of appeal, including the Eighth Circuit, have adopted the same conclusion. *See United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016), citing *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003).

The First Circuit has noted that "[a]lthough it has a comfortably familiar ring, 'outrageous misconduct' is surpassingly difficult to translate into a closely defined set of behavioral norms." *United States v. Santana*, 6 F.3d 1, 3 (1st Cir. 1993). This observation is well taken as "the outrageous misconduct defense is almost never successful." *Id*. at 4. In *United States v. Combs*, 827 F.3d 790, 795 (8th Cir. 2016), the Eighth Circuit reported awareness of only two federal appellate court decisions from the

---

[3] During the hearing, defense counsel stated that the issue presented is not whether entrapment is present. (Tr. at 4.)

1970s in which there was sufficiently outrageous conduct by the government to violate due process.

One of the decisions where the government was found to have engaged in outrageous conduct was *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). In *Twigg*, an informant was asked to approach the defendant about building a methamphetamine laboratory. When Twigg agreed to participate, the government ultimately provided all items necessary for the laboratory including the land where the lab was built, all items needed for the lab such as chemicals that were difficult to obtain, the defendant was subordinate to the informant and did not even know how to manufacture methamphetamine. The other federal appellate court decision wherein a dismissal was ordered for outrageous government conduct was from the Ninth Circuit wherein:

> an undercover agent encouraged the defendants to resume a discontinued bootlegging operation, provided necessary materials, threatened the defendants to accelerate production, and served as the defendants' sole customer.

*Combs*, 827 F.3d at 795, citing *Greene v. United States*, 454 F.2d 783, 786-87 (9th Cir. 1971).

Although due process violations based on outrageous government conduct have rarely been found, the First Circuit conducted an extensive review of cases wherein the doctrine was examined and found two competing views of when it might be applied. "One school of thought holds that the defense should be confined to cases involving extreme physical, and possibly psychological abuse of a defendant." *Santana*, 6 F.3d at

4, citing *United States v. Kelly*, 707 F.2d 1460, 1476 n. 13 (D.C. Cir. 1983) (per curiam) (collecting cases).

> A second school of thought holds that outrageous misconduct may also function as a kind of supplement to the entrapment defense, reserved for those cases where law enforcement personnel become so overinvolved in a felonious venture that they can fairly be said either to have "creat[ed]" the crime or to have "coerc[ed]" the defendant's participation in it.

*Santana*, 6 F.3d at 5, citing *United States v. Mosley*, 965 F.2d 906, 909 (10th Cir. 1992) (collecting cases from eleven circuits recognizing viability of the outrageous conduct defense). In simple terms the Tenth Circuit stated, "[t]he cases on outrageous conduct suggest two factors that form the underpinnings for most cases where the outrageous conduct defense has been upheld: government creation of the crime and substantial coercion." *Mosley*, 965 F.2d at 911.

Recently, the First Circuit examined a third area of outrageous government conduct, that being sexual relations between defendants and government agents. *United States v. Therrien*, 847 F.3d 9 (1st Cir. 2017) (citations omitted). In considering the decisions of other courts of appeals that have previously considered an outrageousness claim where sex is involved, the First Circuit concluded that a claim would succeed only if the government "consciously set out to use sex as a weapon in its investigatory arsenal" or at least "acquiesce[d] in such conduct for its own purposes upon learning that such a relationship existed." *Therrien*, 847 F.3d at 15. In *Therrien*, the defendant asserted that his sexual relationship with the informant should result in dismissal for outrageous government conduct, however, he failed to allege that any law enforcement agency

"encouraged, or even 'acquiesce[d]' to" the informant's participation in the sexual relationship. Under those circumstances the alleged conduct was not attributable to the government. *Therrien*, 847 F.3d at 16, citing *United States v. Simpson*, 813 F.2d 1462, 1467 (9th Cir. 1987) (concluding that an informant's "initial decision to establish a deceptive sexual and emotional relationship" could not "be used to characterize the *government's* conduct" as outrageous (emphasis in original)).

While the three categories of outrageousness identified by the First Circuit encompass many of the cases wherein the defense of outrageous government conduct might be raised, they do not cover all of the possible scenarios in which the defense could be considered. As is the case here, where Trout claims he was coerced into engaging in criminal conduct based on an alleged threat from the CI. Forcing the determination of outrageous government conduct into a mechanical mode is unproductive. *Santana*, 6 F.3d at 6. The First Circuit, elaborated as follows:

> [w]e do not think that the inquiry into outrageousness can usefully be
> broken down into a series of discrete components. Almost by defini-
> tion, the power of a court to control prosecutorial excesses through
> resort to substantive aspects of the due process clause is called into
> play only in idiosyncratic situations—and such situations are likely to
> be highly ramified. Where facts are critically important and fact patterns
> tend to be infinitely diverse, adjudication can often best proceed on a
> case-by-case basis. The outrageousness defense falls into this category.

*Id*. at 6.

Trout alleges he was in essence coerced into procuring the shotgun for the CI based on a request the CI made to a couple of tough guys to "hit [Trout] one good time for [her]." (Tr. at 32.) The CI's request that another individual hit Trout was made to a

third party and not in Trout's presence.  Furthermore, her request was made prior to law enforcement using the CI for the controlled purchase.  The use of informants in government investigations is a frequently used tool by agents of numerous law enforcement agencies.  The Tenth Circuit has held that "coercion of any type must be particularly egregious before it will sustain an outrageous conduct defense." *United States v. Mosley*, 965 F.2d 906, 912 (10th Cir. 1992).  Elucidating on that point, the *Mosley* Court explained:

> "[G]overnment agents may employ appropriate artifice and deception in their investigation." *See Biswell*, 700 F.2d at 1314 (citation omitted).  They may make "excessive offers." *See United States v. Lambinus*, 747 F.2d 592, 595 (10th Cir. 1984),. . .Agents may even utilize "threats or intimidation [if not] exceeding permissible bounds." *See Biswell*, 700 F.2d at 1314

*Mosley*, 965 F.2d at 912.

In *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1338-39 (9th Cir. 1977), a threat was made by an informant to kill the defendant's friends if the defendant didn't go through with a heroin deal.  After viewing the threat in the "context of the vulgarity and 'puffing' engaged in by all participants in the transaction," the Ninth Circuit concluded the threat did not rise to the level of outrageous government conduct.  In a later, similar case the Ninth Circuit added, "[b]ecause threats of the kind found here—scarcely more than bluster—are ordinary bargaining tactics in drug deals, government agents may need to engage in such unsavory conduct to maintain their cover." *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987).

As the Government noted, the Eighth Circuit examines a number of factors to determine whether a private citizen is acting as a government agent, including: "whether the government had knowledge of and acquiesced in the intrusive conduct; whether the citizen intended to assist law enforcement agents or instead acted to further his own purposes, and whether the citizen acted at the government's request. *United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2004). In this case, there's no evidence the law enforcement agents knew the CI had asked her friends to "hit [Trout] one good time for [her]," prior to her work as an informant. As a result the law enforcement did not acquiesce in the alleged intrusive conduct. There is no evidence the CI was acting to further her own purposes other than to secure lenient treatment in unrelated pending criminal cases. Law enforcement did not direct the CI to make the statement that Trout claims is a threat. These circumstances support that the CI was not a government agent at the time of the CI's statement regarding her wish that her friends would "hit [Trout] one good time for [her]."

The evidence presented in this case supports that the CI had a relationship with Trout in which the sale of firearms was a familiar topic of discussion. Both Trout and the CI were convicted felons who admired firearms and were prohibited from possessing them. The record supports that regardless of whether Trout and the CI, or Trout's son and the CI, or all three had a dispute about the terms of the agreement related to the CI purchasing a shotgun, Trout wanted to square up whatever it was that he owed the CI.

The governmental conduct Trout complains of does not shock a universal sense of justice. Trout presented no evidence that the law enforcement officers caused any threats

to be made against Trout after the CI became an informant. In this case, officers engaged in a permissible investigative method—utilizing an informant to facilitate the commission of a crime—the purchase of a firearm by a prohibited person, Trout, who was willing and able to procure a firearm for the CI prior to law enforcement initiating the investigation.

Even if Trout was motivated to assist the CI in purchasing a firearm as the result of the alleged threat that Trout heard through rumor, such conduct cannot be attributed to law enforcement. The alleged threat was even characterized by defense counsel as being "second or third hand" from the CI. (Tr. at 39.) The CI's request that the two men "hit [Trout] one good time for [her]" does not support a defense of outrageous government conduct. The undersigned is not convinced that the CI's request is in actuality a threat as Trout was not even present when she made the statement and there's no evidence the men planned to honor the CI's request. Significantly, whether a threat or not, the CI's request occurred prior to law enforcement enlisting the CI's assistance with the controlled purchase of the firearm. Furthermore, there is no evidence that law enforcement officers were even aware of what transpired with regard to the CI's request.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Dismiss the Indictment for Outrageous Conduct (Doc. 19) be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for

good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of April, 2017.